IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

*FILED*

*02 SEP 30 PM 3: 42*

*U.S. DISTRICT COURT*
*N.D. OF ALABAMA*

| | | |
|---|---|---|
| VAN AMERICAN INSURANCE COMPANY and UNITED STATES FIDELITY AND GUARANTY COMPANY, | } } } } | |
| **Appellants** | } } } | |
| v. | } } } | CV-01-BE-2246-S |
| ANDRE TOFFEL, TRUSTEE OF THE BANKRUPTCY ESTATE OF ALABAMA LAND AND MINERAL AND MID-SOUTH RESOURCES, | } } } } } | |
| **Appellee** | } } | |

**ENTERED**

SEP 3 0 2002

## MEMORANDUM OPINION

These cases[1] are before this court on the appeal from the denial of the Allowance and

Payment of Administrative Expense Claims filed by United States Fidelity & Guaranty Co.

("USF&G") (now known as St. Paul Fire & Marine Insurance Co.) and Van American Insurance

Co. (hereinafter referred to collectively as "the Bonding Companies"). The Bonding Companies

issued reclamation bonds on behalf of Alabama Land and Mineral ("ALM") and Mid-South

Resources Corporation ("Mid-South")(collectively referred to as "the Debtors") to the Alabama

Surface Mining Commission ("ASMC"). The Bonding Companies asserted an Administrative

Priority claim for earned premiums due on Reclamation Bonds and for the cost of reclaiming

mining sites or forfeiting surface mining reclamation bonds. The Bonding Companies assert two

---

[1] Two cases were originally filed, one involving Alabama Land and Mineral, and one involving Mid South Resources. On appeal Judge C. L. Smith Jr., granted a motion to consolidate because the issues are similar and because of judicial efficiency. These cases were reassigned to this judge on November 21, 2001.

*15*

separate claims for administrative expenses: (1) chapter 11 administrative expenses for bond premiums that were accrued and in arrearage during the chapter 11 proceeding, and (2) chapter 7 administrative expenses for amounts that the Bonding Companies would have to pay for the forfeiture of surety bonds or the cost of reclamation to be undertaken on behalf of the debtor. The bankruptcy court held that the Bonding Companies were  not entitled to administrative expense priority on either of the claims because the chapter 11 expenses were not proven to the requisite specificity and the chapter 7 claims do not qualify as actual and necessary expenses of the estate, or in the alternative, do not qualify as an environmental claim.  After the final order, the Bonding Companies appealed.  Based on the reasons below, the decision of the Bankruptcy Court is affirmed.

## I. Jurisdiction and Standard of Review

Jurisdiction lies pursuant to 28 U.S.C. § 158(a)(1), which states, "[t]he district courts of the United States shall have jurisdiction to hear appeals...from final judgments, orders, and decrees... of bankruptcy judges." An order is final if it essentially ends the litigation and leaves the court nothing to do but execute the judgment. *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 109 S.Ct. 1494, 103 L.Ed.2d. 879 (1989).

The bankruptcy court's findings of fact will not be disturbed unless clearly erroneous, and  the findings of law will be reviewed *de novo.  See In re Terrell*, 75 B.R. 291 (N.D. Ala. 1987).

## II. Background

USF&G issued reclamation bonds on behalf of ALM and Mid-South to reclaim mined property located in the State of Alabama.  USF&G issued the performance bonds to the ASMC.

Van American is the service manager for a coal mining reclamation program administered on behalf of USF&G. The Bonding Companies provide environmental sureties and issue bonds to secure performance of reclamation obligations and duties.[2]

The Bonding Companies seek to recover the costs of either reclaiming the land that was covered by the bonds and/or forfeiting the face amount of the bonds to the ASMC as administrative expenses. The Bonding Companies claimed they are entitled to an administrative expense claim because 1) they provided a substantial benefit to the estate; 2) they are the subrogee of the State of Alabama; and 3) the environmental nature of the case requires that the claim be afforded administrative expense status. The Bonding Companies also asserted a chapter 11 administrative expense claim for bond premiums that were due and not paid during the chapter 11 case.

The Trustee objected to the allowance of administrative expense claims for the costs of either reclaiming the land that was bonded or forfeiting the face amount of the bond to the ASMC. The Trustee claimed that 1) no substantial benefit incurred to the estate; 2) the Bonding Companies are not subrogated to the position of the State of Alabama or in the alternative subrogation is irrelevant; and 3) this case is not an environmental case that would require the allowance of these costs as administrative expenses. Further, the Trustee claimed the Bonding Companies did not prove the unpaid bond premiums that are in arrearage from the chapter 11 case with the requisite specificity.

Mid-South, one of the debtors, was formed in December 1995, to acquire the assets of

---

[2] The introduction of the parties and factual background is taken from the opinion of the bankruptcy court, Tamara O. Mitchell, Findings of Facts pp 3-15. Cited as "Op. at __."

Costain Coal Company and to own all of the stock of ALM, the other debtor and a wholly owned subsidiary of Mid-South.  Debtors and the Bonding Companies began their relationship on or about December 19, 1995, when the Debtors began executing agreements between the parties. The Bonding Companies posted surety bonds with ASMC totaling approximately $16,500,000.00.  These bonds were reclamation bonds to assure that reclamation occurred.[3]  If the Debtors failed to perform the requisite reclamation, the Bonding Companies would be forced to perform the requisite reclamation or forfeit the face amount of the bond, the maximum amount for which the Bonding Companies would be liable.  The Debtors issued the Bonding Companies a $1,000,000.00 letter of credit and granted security interests in various items of personal property as collateral.

The Debtors began mining in various locations in Alabama in January of 1996.  The primary business of the Debtors was surface or strip mining.[4]  The State of Alabama regulates the business of strip mining through the ASMC.  Alabama law requires a mining company obtain a permit and a license, and post a surety bond to assure the mined land will be reclaimed.  *See* Ala. Code § 9-16-70 *et seq*.  The surety bond remains in effect until reclamation is complete or the ASMC releases the miner from liability because of an assignment of the permit to another mining company.  Trans. at 113-115.[5]

---

[3]Reclamation is the process of "converting mined land to its former or other allowable use." Ala. Code § 9-16-72(14).  Reclamation occurs in three phases: 1) grading, 2) planting of vegetation, and 3) confirming that the requisite amount of vegetation is growing.  The Bonds are also released partially after completion of each of those phases. *See generally,* Ala. Code § 9-16-89(9).

[4]Surface and strip mining are one in the same, and will be referred to as strip mining throughout this opinion.

[5]The official transcript of the hearing will be cited as "Trans. at ___."

Prior to the filing of chapter 11, which was subsequently converted to a chapter 7 case, the Debtors were engaged in strip mining on property that they leased in Alabama.  Under the Alabama Surface Mining Act, one must apply for a permit to engage in strip mining and post a surety bond to assure the State that reclamation of mined areas will be done.  *See* Ala. Code § 9-16-89, (1975).  If the permitee fails to reclaim the property in accordance with Alabama law, then the surety bond is forfeited to the State of Alabama.  *See* Ala. Code § 9-16-8 (1975).

The Alabama Surface Mining Act is a regulatory scheme intended to maximize economic potential and provide for responsible business practices.  *See* Ala. Code § 9-16-3.  To assure compliance with responsible business practices, the Act consists of two main components.  The first component is the ability of the ASMC to ensure that the mining companies are acting in accordance with State law by performing inspections, and issuing notices of violations; if the violation is not cured, the ASMC issues a cessation order until the violation is abated or the ASMC can revoke the company's mining permit.  *See* Ala. Code §§ 9-16-92, 9-16-93 (1975).  The second component requires that a surety bond be posted to assure that reclamation is completed.  *See* Ala. Code § 9-16-89.

On June 1, 1998, the Debtors filed for Chapter 11 bankruptcy.  At that time, the Debtor in possession continued the mining operations.  While operating in chapter 11, the Debtor was mining and continuing reclamation work, which is evidenced by the release of approximately $4,500,000.00 in bonds.  Trans. at 94.  During the continued mining operations, less than $4,500,000.00 in future reclamation costs were incurred.  *Id.*  The total estimated liability of the Bonding Companies is $8,730,028.00, after reclamation work and the forfeiture of some $6.3 million in bonds.  The bankruptcy court found these estimates reasonable as of the date of the

5

trial.[6]  Op. at 12.

The chapter 11 case was converted to chapter 7 on April 7, 2000, and a trustee was appointed.[7]  The Trustee took possession of the books, records, and assets of the Debtors and proceeded with the administration of the estate by collecting monies due and liquidating assets. The court noted in its opinion that the Trustee

> 1) made arrangements with Alabama Coal Cooperative to allow removal of their coal from the Port Walker site (the estate received 10 cents per ton of coal removed), 2) sold a stock pile of coal to Powell Sales, 3) cooperated with other entities to allow removal of their property and/or equipment from the property, and 4) engaged in other similar activities.

Op. at 10.

The bankruptcy court held that 1) the administrative expense claim for chapter 11 bond premiums in arrearage was not proven to the requisite specificity; 2) the chapter 7 claim for forfeited reclamation bonds or reclamation expenses was not entitled to administrative priority; 3) this case did not require an environmental analysis; and 4) subrogation was irrelevant as the ASMC would be a general unsecured creditor who is in no better position than the Bonding Companies.

### III. Issues on Appeal

The Bonding Companies make several claims on their appeal.  First, the Bonding Companies argue that the bankruptcy court erred in allowing the accuracy of stipulated exhibits to be questioned by the Trustee.  Second, the Bonding Companies claim that the bankruptcy

---

[6]The liability of the Bonding Companies will be further reduced by $1,000,000.00, the amount of the line of credit the Debtors posted that was paid.  Op. at 15.

[7]The trustee appointed for this case is Andre Toffel (hereinafter referred to as "the Trustee"), a named party to this proceeding.

court erred in not granting chapter 11 administrative expenses for bond premiums that accrued during the chapter 11 case.  Third, the Bonding Companies claim the bankruptcy court erred in failing to allow the Bonding Companies to supplement the Record on Appeal.  Fourth, the Bonding Companies claim that the bankruptcy court erred in denying chapter 7 administrative expenses for amounts that they would be forced to pay to reclaim mine sites or for the face amounts of the bonds that would be forfeited. Next, the Bonding Companies claim that the bankruptcy court failed to view this case in light of environmental policy in its denial of administrative expenses.  Finally, the Bonding Companies claim that the court disregarded the subrogation rights of the Bonding Companies to step into the position of the State of Alabama. For the reasons stated below, the court affirms the decision of the bankruptcy court.

### A. Bond Premium Arrearage

The Trustee and the Bonding companies agreed that bond premiums in arrearage would be afforded administrative expense priority had they been proven.  The Bonding Companies raise three issues relating to bond premiums in arrearage:   1) whether  witnesses can be cross-examined on documents submitted on a joint stipulation of admissibility; 2) whether administrative expense priority should be granted to bond premiums in arrearage during administration of the chapter 11 case; and 3) whether  the bankruptcy court should have allowed the Bonding Companies to supplement the Record on Appeal.

### 1. Challenge of Stipulated Exhibits

The Bonding Companies contend the bankruptcy court erred in allowing the Trustee to question the truthfulness of Exhibit 23, which purported to show evidence of bond premiums in arrearage.  Both parties agreed to stipulate as to the admissibility of exhibits to streamline the

7

hearing.[8]  The Bonding Companies contend that because both parties stipulated to the

admissibility of the evidence, the Trustee could not cross-examine witnesses concerning the

accuracy of the document.

Stipulating to the admissibility of a document eliminates the need to authenticate the

document.  *See* Fed. Rul. Evid. 802, 901.  However, simply agreeing that an exhibit is admissible

does not waive the ability to cross-examine the witnesses concerning the contents of the

document.  A stipulation only allows evidence to be admitted; however, as with all evidence, the

finder of fact must determine the reliability and veracity of the evidence admitted.

The Bonding Companies cite *Noel Shoes, Inc. v. United States*, 721 F.2d 327 (11th Cir.

1983)(Vance, J., dissenting) in support of their argument.  However, the dissent noted that once

the parties stipulated to the admissibility of evidence, the parties should not be able to reverse

their position and *object* to the evidence.  721 F.2d at 331.  In this case, the Trustee did not

object to the admissibility of Exhibit 23, but questioned witnesses as to its content.  According

to the transcript, the parties stipulated to the admissibility of certain documents.  Trans. at 23-24

and Trans. at 33-34.  Further, counsel for the Trustee stated that, to the extent proven, the bond

premiums due during the chapter 11 case would be afforded administrative expense priority.

Trans. at 24.  However, no presumption of correctness exists  regarding claims of administrative

expenses; the burden of proof rests on the party seeking the administrative expenses to prove the

amount of such expenses.  *See* 4 *Collier on Bankruptcy* ¶ 503.04[1] (Lawrence P. King, ed., 15th

---

[8]The bankruptcy court stated during the hearing that, "the claimant then has offered for technical admission ... the documents that are listed on the joint submission of stipulated Exhibits." Trans. at 32.

ed. Rev. 2000).[9]  During the hearing on the amount and validity of the administrative expenses

for bond premiums in arrearage, the Trustee questioned the president and CEO of Van

American, Rick Thomas, as to the calculations in the stipulated exhibit.  However, when

testifying about how the premiums were calculated, Mr. Thomas provided statements that when

calculated according to his testimony arrived at an amount lower than the amount shown on the

document.  No other witnesses testified concerning the accuracy of the figures, so the court

concluded that the amounts reflected in the exhibit were not credible.

Cases that the Bonding Companies cite are along the lines of *Waldorf v. Borough of*

*Kenilworth*, 878 F.Supp 686 (D. N.J. 1995), *aff'd.* 142 F.3d 1256 (9th Cir 1999), where the

parties stipulated to facts, not to the admissibility of evidence and those cases are, therefore,

distinguishable.  When the parties stipulate to a fact, they accept the fact as true and accurate;

however, when stipulating to the admissibility of evidence, the parties merely accept that the

documents are admissible in court to effectuate judicial economy.   Parties often stipulate to the

admissibility of exhibits to save time at trial.  However, such stipulations only relate to the

authenticity and the admissibility of such exhibits, not to the truthfulness of the facts contained

in the exhibits.  If the latter were the case, once an exhibit is entered into evidence, the finder of

fact would be required to take the evidence as true instead of examining the evidence for its

reliability and for its veracity.

Because the parties stipulated only to the admissibility of exhibits and not to the facts

contained in those exhibits, the court committed no error in allowing the Trustee to cross-

examine witnesses about the information contained in  Exhibit 23.  Therefore, the court properly

---

[9]Hereinafter cited to as *"Collier on Bankruptcy* ¶ ___.__[ ]."

allowed cross-examination of witnesses concerning the calculations of bond premium arrearage for chapter 11.

### 2. Chapter 11 Administrative Expenses

The Bonding Companies contend that the disallowance of bond premiums in arrearage during the chapter 11 case constituted error. The party submitting administrative expense claims has the burden to establish to the court's satisfaction the value of the claim; otherwise, the court must deny the claim. *See Collier on Bankruptcy* ¶ 503.04[1]. The Trustee and the Bonding Companies agreed that the premiums in arrearage because of the chapter 11 case are administrative expenses. However, the question of the amount of bond premiums in arrearage remained open. As noted above, the bankruptcy court did not err in its allowance of cross-examination of witnesses on stipulated exhibits. A discrepancy arose between the amounts shown in the documents and amounts testified. Therefore, because the Bonding Companies did not prove the claim with the requisite amount of certainty and did not provide additional witnesses who could prove the correct amount of the claim, the court was unable to determine the amount of the claim. The Bonding Companies had the opportunity to show the amount of past due premiums during the hearing and did not provide credible evidence of the claim. The bankruptcy court properly denied the claim for bond premiums because the Bonding Companies provided no credible evidence of the amount of premiums in arrearage.

### 3. Supplementing the Record on Appeal

The Bonding Companies also contend that they should have been allowed to supplement the Record on Appeal. The Bonding Companies claim the court's denial to supplement the Record on Appeal ignored the reconsideration of a claim as provided in 11 U.S.C.A. § 502(j).

10

Section 502(j) provides: "[a] claim that has been allowed or disallowed may be reconsidered for cause. A reconsidered claim may be allowed or disallowed according to the equities of the case." The reconsideration of a claim is at the discretion of the court; in short, the court may in its discretion reconsider a claim but it need not do so or reverse its position. *See Collier on Bankruptcy* ¶ 502.11[4]; *See* Fed. Rule Bankruptcy Proc. 3008, 1983 advisory committee note. The bankruptcy court denied the motion to supplement the Record on Appeal. Judge Mitchell stated that the Bonding Companies did not request or receive leave of court to supplement the record and the Bonding Companies did not state or allege any basis to supplement the record; therefore, the motion to supplement the Record on Appeal was denied.. Order at 2.[10]

The Bonding Companies assert that any new evidence bearing on their claim should be considered by the court. However, the "new" evidence is not new. The evidence the Bonding Companies wish to supplement is the same evidence that was "testified to extensively at trial." App. Brief at 47. The Bonding Companies, by their own admission, used this evidence at trial and failed to prove their claim to the requisite specificity at trial. The Bonding Companies should not now be able to supplement the Record with evidence that was presented at trial. During trial, the parties have the opportunity to present evidence to support their position; and the parties bear the burden of providing the best witnesses to explain such evidence. Having a witness who is unfamiliar with evidence or how it was obtained is not a sufficient reason for reconsideration of a claim or supplementing the Record. The Bonding Companies had the opportunity to show the amount of past due premiums, but failed to meet their burden. Denying the Bonding Companies a second chance to prove those amounts is well within the discretion of

---

[10]Order of July 25, 2001, by Judge Tamara O. Mitchell.

11

the court. The record is devoid of any evidence of an abuse of discretion; therefore, the denial of the motion to supplement the Record on Appeal is affirmed.

### B.  Chapter 7 Administrative Expense Claims for Forfeited Bonds and Reclamation

The Bonding Companies claim the bankruptcy court erred in not allowing their claim for the amount of the forfeited bonds and reclamation work to be afforded administrative expense priority.   Administrative expense priorities are available in both chapter 11 and chapter 7 cases. In the case of a chapter 11 case converted to a chapter 7 case, the chapter 7 administrative expenses are paid before the chapter 11 administrative expenses are paid.  The Bonding Companies claim that bond forfeitures and costs of reclamation are 1)  actual and necessary expenses of preserving the estate; or 2) of an environmental concern that requires special consideration.

#### 1. Actual and Necessary Costs

The allowance of an administrative expense claim is designed to make money of the estate available to pay for the "actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case...." 11 U.S.C. § 503(b)(1)(A). An expense must be an actual and  necessary cost of preserving the estate to qualify for an administrative expense claim.  Actual and necessary expenses of preserving the estate are usually found in the context of continuing the debtor's business. "Proper preservation may require, for example, outlays for repairs, upkeep, freight, the hiring by the trustee of custodians and insuring the value of the property." 4 *Collier on Bankruptcy* ¶ 503.06[1].  Further, actual and necessary "expenditures of the trustee in operating the business of the estate. . . and rehabilitating the estate are certainly contemplated." *Id.*

12

The policy behind the granting of administrative expense claims is most prevalent in the scope of chapter 11 cases that are later converted to chapter 7. In an attempt to give a company a "fresh start" and to maintain its operations, assuring the creditors who assist in the rehabilitation of a debtor some priority in payment is important; otherwise, creditors would not deal with bankrupt corporations and the purpose of chapter 11 of rehabilitating the debtor would be undermined. *See In re N.P. Mining Co.,* 963 F.2d 1449 (11th Cir. 1992). Administrative expense priority is granted under 11 U.S.C. § 503(b)(1)(A) to "provide an incentive for creditors and others to continue or commence doing business with an insolvent entity." 4 *Collier on Bankruptcy* ¶ 503.06[2]; *see In re Mammoth Mart, Inc.,* 536 F.2d 950 (1st Cir. 1976); *In re Jartan, Inc.,* 732 F.2d 584, 588 (7th Cir. 1984) (administrative priority is granted to post-petition expenses so third parties will be encouraged to provide the goods and services necessary for a successful reorganization).

The costs associated with surety bonds do not qualify as administrative expenses because they fail to meet the two main requirements. To qualify as a "necessary preservation expense it must satisfy two requirements: (1) it must have arisen from a transaction with the estate and (2) it must have benefitted the estate in some demonstrable way." *Collier on Bankruptcy* ¶ 503.06[3]. An administrative expense claim can only occur from a transaction with the estate and the "estate" comes into existence on the date the bankruptcy petition is filed. 11 U.S.C. § 541(a). This principle is "derived from the reference in section 503(b)(1)(A) to the 'estate.'" 4 *Collier on Bankruptcy* ¶ 503.06[3][a]. Therefore, to qualify as an administrative expense, the expense must arise from a post-petition transaction. "[I]t is not enough that payment becomes due after the petition date if the transaction was entered into with the debtor prepetition." *Collier*

13

*on Bankruptcy* ¶ 503.06[3][a].

Further, the postpetition transaction must also provide a benefit to the estate. Although, no textual base supports the requirement of providing a benefit to the estate, case law interpreting the pre-code predecessor of 503(b)(1)(A) provides the requirement. *Id.*; *see also, Trustees of Amalgamated Ins. Fund v. McFarlan's,* 789 F.2d 98, 101 n.1 (2nd Cir. 1986)(noting that section 503(b)(1)(A) was derived from section 64a(1) of the former bankruptcy act and is similar enough in language that judicial interpretations of the old act remain relevant). The benefit analysis tests whether an expense is "necessary" to the preservation of the estate.

Determining whether a benefit to the estate occurred is fact specific to each case. A benefit occurs in many forms. The Bonding Companies have provided no benefit to the estate according to the rationale in *Jartan*. *See In re Jartan,* 732 F.2d 584 (7th Cir. 1984). In *Jartan*, a debtor contracted for an advertisement to run in telephone directories. By executing the contract, the creditor was obligated to publish the advertisements even though the advertisements would not be published for several months. 732 F.2d at 585. The debtor would be billed after the advertisements ran. The debtor filed for chapter 11 bankruptcy after the contract was executed but before the ads ran. The creditor argued that, because the ad ran postpetition and benefitted the debtor, its claim should be afforded administrative priority under § 503. 732 F.2d at 587. The court held that the inducement and the obligation occurred prepetition; therefore, the policy of § 503 was not served by granting administrative priority.

As in *Jartan*, the case at hand involved prepetition contracts that sealed the obligation of the Bonding Companies. The reasoning in *Jartan* applies because, in Alabama, surety bonds are required to be non-cancellable; therefore, the Bonding Companies are obligated to perform even

14

if the debtor becomes insolvent. *See* Ala. Code § 9-16-8.

In the case at hand, the execution of the surety bonds was not a transaction with the estate but rather a transaction with the pre-petition debtor. The Bonding Companies entered into a contract with the debtor and now wish to be granted administrative expense priority simply because the obligation to pay occurred postpetition. Such priority should not be allowed.

The Bonding Companies frequently cite to *In re Coal Stripping*, 222 B.R. 78 (W.D. Penn. 1998), for support of their argument that they should be afforded administrative priority for the amount of bonds forfeited and the amount of reclamation costs. However, *Coal Stripping* actually supports the position of the Trustee and the Bankruptcy court.

In *Coal Stripping*, the debtor was engaged in strip mining in West Virginia when the debtor filed for chapter 11 bankruptcy. *Coal Stripping* 222 B.R. at 79. The debtor had obtained reclamation bonds because West Virginia also requires the posting of reclamation bonds. During the chapter 11 case, the debtor did not engage in reclamation, and as a result the bonding company was forced to forfeit two surety bonds with a total value of $82,000, and the bonding company filed an administrative expense claim. 222 B.R. at 79-80. The court held that "*if* reclamation was performed postpetition [by the State] the costs will be administrative expenses of this chapter 11 bankruptcy estate." 222 B.R. at 82 (emphasis added). However, the administrative expenses were still subject to proof. The court referenced "certain obligations, including an on-going duty to restore the land." 222 B.R. at 82. Where the penalty assessed was for post petition conduct and was considered to be a cost incidental to the operation of the business, then the court found that it would be afforded administrative expense priority. *Id. See also*, *In re Bill's Coal*, 124 B.R. 827 (D.Kan. 1991).

15

In *Coal Stripping,* the question of whether the state was forced to perform reclamation was still at issue, which is not the case here. *See also, In re Chateaugay,* 944 F.2d 997, 1010 (2nd. Cir. 1991) (the court noted that the EPA had a claim of administrative expenses because "it is acting, during administration of the estate...."). To have an administrative expense claim, the Bonding Companies must prove that the ASMC performed post-petition reclamation. In this case, by contrast, no evidence in the Record reflects that ASMC has performed any reclamation after the chapter 11 filing. Therefore, the Bonding Companies failed to meet their burden of proof.

The Bonding Companies also contend that the Trustee operated the estate after the case was converted to chapter 7. Winding up the affairs of the estate via sales of equipment, coal stockpiles and such is not the same as operating an estate in chapter 11. *In re N.P. Mining,* 963 F.2d 1449, 1461 (11th Cir. 1999). The estate in chapter 11 attempts to save the existing business through operating as a debtor in possession or by the trustee. In chapter 7, the trustee liquidates the assets of the debtor to satisfy debts incurred, so the Trustee usually is not engage in operations.[11] 963 F.2d at 530-31.

The Debtors, in the instant case, continued their obligation to reclaim during chapter 11 as evidenced by the release of some $4-$5 million in bonds. Op. at 31-32. Allowing the Bonding Companies administrative expenses for forfeited bonds and reclamation costs in this case would not be  proper because the costs were not actual and necessary expenses of the estate

---

[11]In this case Milton McCarthy, general counsel for the ASMC, testified that the Trustee in this case would not be considered to be an operator for the purposes of the mining code. *See* Ala. Code § 9-16-70. *et seq*, Op. at 28 n.36. McCoy testified that the person engaging "in the activity is not necessarily a coal operator but the activity itself would be [] subject to regulation [by the ASMC]...." Trans. at 264.

and no benefit was provided to the estate.

### 2. *Environmental Protection*

The Bonding Companies claim this case involves environmental protection, thereby requiring special consideration. Section 503(a)(1)(A) is interpreted to include "those [expenses] necessary to abate violations of state and federal environmental regulations." 4 *Collier on Bankruptcy* ¶ 503.06[4]; *See In re Chateaugay Corp.*, 944 F.2d 997 (2nd Cir 1991), *In re N.P. Mining Co, Inc.*, 963 F.2d 1449 (11th Cir. 1992). Generally, courts interpret § 503(a)(1)(A) to allow postpetition environmental claims as a transaction with the estate and are afforded administrative expense priority.

The time for determining when an environmental claim arises is a fact specific question. An environmental claim may arise at one of three times: (1) when the debtor's earliest acts related to the environmental contamination occur; (2) when hazardous material is actually released into the environment; or (3) when parties, including environmental control agencies, become aware of an environmental problem and potential clean-up costs. *Collier on Bankruptcy* ¶ 503.06[4][a]. The circumstances dictate the period at which an environmental claim arises, as each situation is different.

The leading environmental case in bankruptcy is *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494, 106 S.Ct.755, 88 L.Ed.2d.859 (1986). In *Midlantic,* the Court held that a "trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identifiable hazards." *Midlantic*, 474 U.S. at 507, 106 S.Ct. at 767. In *Midlantic,* a waste oil processing company, Quanta, had plants in New York and New Jersey. The New Jersey

17

Department of Environmental Protection (NJDEP) discovered Quanta had accepted oil

contaminated with polychlorinated biphenyls (PCB's) in violation of its operating permit.  While

Quanta and NJDEP were negotiating a clean-up of the plant, Quanta filed for chapter 11.

Shortly after the NJDEP ordered the clean-up, Quanta filed for chapter 7, and pursuant to 11

U.S.C.A. §554(a), the trustee attempted to abandon the property.  The bankruptcy court allowed

the abandonment; however, the appeals court and the Supreme Court ruled that the trustee could

not abandon the property.  The Court noted that 28 U.S.C.A. § 959(b) requires the trustee to

"manage and operate [the property of the estate] according to the requirements of the valid laws

of the State in which such property is located." *Midlantic*, 474 U.S. at 505, 106 S.Ct. at 761.

     *Midlantic* is distinguishable from the case at hand for several reasons.  As the court in

*Coal Stripping* noted,  "[a] strong policy exists in favor of the enforcement of environmental

laws to protect public health and safety." 222 B.R. at 82.  The court in *Coal Stripping* did not

make a distinction between hazardous and nonhazardous waste. 222 B.R. at 82.  First, in the

current situation, Alabama has in place a bonding and regulating scheme that is intended to

provide for reclamation of mining sites, which was not the case in *Midlantic*.  Second, the debtor

in possession in this case not only operated within the regulations, but lowered the potential

liability of the Bonding Companies during the chapter 11 case by continuing to reclaim the land,

unlike the debtor in *Midlantic*.  Trans. at 94; *cf. Midlantic* 474 U.S. 494.  Also, the *Midlantic*

opinion contains  no mention of a surety that posted bonds to assure compliance with state laws.

     The Bonding Companies again rely on *Coal Stripping* for the argument that they should

be accorded chapter 7 administrative expense for forfeited reclamation bonds or reclamation.

222 B.R. 78 (W.D. Penn. 1998).  However, in *Coal Stripping* the surety company potentially

was only given an administrative expense claim for the amount of a forfeited bonds during chapter 11 if the state was forced to reclaim the bonded area.[12]  In short, only when the state liquidates clean-up costs by acting during the administration of the bankruptcy case will the Bonding Companies be allowed an administrative expense claim.

The court in *Coal Stripping* stated that, to the extent the surety could prove the State of West Virginia reclaimed property abandoned during chapter 11, the surety would be able to recover for those bond forfeitures.  In *Coal Stripping*, the debtor operated postpetition, and caused an additional suety bond to be forfeited during chapter 11 because the debtor did not continue reclamation.  That fact distinguishes *Coal Stripping* from this case.

Further, the court in *In Re Pierce Coal*, 65 B.R. 521, 529 (N.D.West Vir. 1986), stated that the "cost of reclaiming the area disturbed by Pierce, *as a debtor in possession,* is entitled to administrative priority." (emphasis in original).  However, in *Pierce*, testimony revealed that the debtor in possession "failed to comply with an ongoing regulatory obligation to... generally reclaim the four permit sites throughout the bankruptcy." 65 B.R. at 524.  Also, only 10% of the total amount of the bonds forfeited were afforded administrative priority as having been incurred for land disturbance done post-petition.[13]

Many cases have held that costs of clean-up action taken *during* the administration of the estate will be afforded administrative priority.  See *Commonwealth of Pennsylvania, Dep't of*

---

[12]In *Coal Stripping*, the court scheduled an evidentiary hearing to determine the total amount West Virginia spent in reclaiming mining sites.  The court stated that the bonding companies in that case could recover, as administrative expenses, the amount that West Virginia spent in reclaiming mining sites if West Virginia actually did reclaim mining sites.
[13]The court reached 10% by taking the whole project and determining that 10% of the total disturbance was done post petition.  The other 90% of the bonds forfeited were not given administrative priority rather it was determined to be a general unsecured claim.  Id. at 531.

*Natural Res. v. Conroy,* 24 F.3d 568, 569 (3rd Cir. 1994) (response costs incurred by
environmental agencies entitled to administrative expense priority); *In re Wall Tube & Metal
Prod.,* 831 F.2d 118, 124 (6th Cir. 1987) (state entitled to administrative expense claim for its
response costs for CERCLA claim); *In re Distrigas,* 66 B.R. 382, 386 (Bankr.D.Mass. 1986)
(state entitled to an administrative expense claim to the extent the state expended funds to clean-
up contaminated property ); *In re Stevens,* 68 B.R. 774, 783 (D.Maine 1987) (state entitled for
costs incurred in removing waste from property of the estate (during the administration of the
chapter 7 case).  The state or regulatory agency must liquidate its claim for clean-up costs during
the administration of the estate to receive administrative expense priority.

 In *Midlantic*, *Wall Tube*, and other cases, the state or regulatory agency acted during the
administration of the estate and liquidated the amount of damages incurred.  The liquidation of
damages in addition to the irresponsible actions of the debtors in those cases differ from the case
at hand.  In the present case,  the ASMC did not act during the administration of the estate
because the Debtors remained in compliance of the Alabama Surface Mining Act.

 *Midlantic* and its progeny, although compelling,  are not applicable in the case at hand.
Because neither the state of  Alabama nor the ASMC  liquidated the costs of clean-up during the
administration of the chapter 11 case,  the environmental argument is not persuasive.  As noted,
all of the cases granting administrative expense priority for environmental clean-up occurred
when the state or regulatory agency liquidate its claim against the debtor.  Because the state did
not liquidate the clean-up claim, the state is no more than a general unsecured creditor, which
will be addressed further in the subrogation portion of this opinion.  Without liquidation, the
denial of administrative expense priority for the costs of forfeited bonds or reclamation expenses

is proper.

### E.  Subrogation

The Bonding Companies claim the amounts they will be forced to expend for reclamation work and face amounts of bonds to be forfeited should be given administrative expense priority because they have subrogation rights against the Debtors.  The Bonding Companies claim that they are entitled to step into the shoes of the ASMC pursuant to 11 U.S.C. §509.  Surety bonds represent joint and several obligations that the parties have entered into freely and with knowledge that they may be required to pay.  *In re Chateaugay Corp.*, 89 F.3d 942 (2nd Cir. 1996) (*Chateaugay II*).

The Bonding Companies' obligation to pay is contingent on the Debtors' failure to fulfill the obligation to reclaim the land; subrogation provides the means by which the Bonding Companies intend to recover if the Debtors do not fulfil their obligation to perform reclamation. Subrogation in Bankruptcy is governed by § 509(a).  Section 509 provides:

> [e]xcept as provided in subsection (b) or (c) of this section, an entity that is liable with the debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such a claim, is subrogated to the rights of such creditor to the extent of such payment.

11 U.S.C. § 509(a).  In short, to the extent the Bonding Companies have paid or performed or will pay or perform for reclamation expenses, the Bonding Companies assert they are subrogated to the rights of the ASMC.

If the ASMC could be granted administrative expense status, then the Bonding Companies would be subrogated to that position.  The Bonding Companies assert § 509(a) allows them to be subrogated to the rights of the State of Alabama.  That claim leads to a

determination of what priority the ASMC would have. However, if the ASMC is in no better position than a general unsecured creditor, then the Bonding Companies are in the same position and the issue of subrogation is irrelevant.

In *Pierce Coal,* the court stated that a claim for a bond forfeiture is a general unsecured claim. *In re Pierce Coal*, 65 B.R. at 531. Further the court noted that "[t]hese prepetition expenses were not incurred by the debtor in possession, and their priority in relation to other unsecured claims is determined by 11U.S.C. § 507. This court agrees... the bankruptcy court has no authority to elevate a prepetition unsecured claim to an administrative priority." 65 B.R. at 531.

Several courts have held that states are general unsecured creditors regarding environmental claims that have not been liquidated. *See Ohio v. Kovacs*, 469 U.S. 274, 286, 105 S.Ct. 705, 711, 83 L.Ed.2d 649 (1985) (holding Ohio's injunction ordering clean up of a hazardous waste site was no more than a general unsecured claim); *Southern Railway Co. v. Johnson Bronze Co.*, 758 F.2d 137, 141 (3rd Cir. 1986) (holding that South Carolina's administrative order had not been reduced to judgment; therefore, state held a general unsecured claim).

Because the ASMC did not act during the administration of the estate and has not liquidated a claim against the Debtors, the ASMC has only a general unsecured claim against the estate and subrogation is irrelevant.[14] Therefore, because the ASMC would only have a general unsecured claim against the Debtors, the Bonding Companies do not gain priority

---

[14]The State could potentially have a claim against the estate for money expended in excess of the bond amounts. Trans. at 291. However, this also would be a general unsecured claim.

through subrogation. The bankruptcy court correctly determined that the ASMC is only a general unsecured creditor; if the Bonding Companies step into the shoes of the ASMC, their claim likewise is that of a general unsecured creditor. Therefore, the decision denying priority is affirmed.

### IV. Conclusion

The Bonding Companies failed to establish error in the decision of the bankruptcy court. The stipulation of admissibility of exhibits does not prohibit cross-examination about the content of those exhibits, as the Bonding Companies claim. The acknowledgment by the Trustee that the premiums in arrearage during chapter 11 qualify as administrative expenses does not extinguish the requirement of proper proof as to their amount. The Bonding Companies did not provide that proof; therefore, the bankruptcy court properly denied that claim.

The bankruptcy court acted within its discretion to reconsider the claim and to determine whether to supplement the Record on Appeal. The Bonding Companies offered no evidence of an abuse of discretion. Therefore, this court will not disturb the bankruptcy court's decision not to reconsider.

The Bonding Companies likewise did not demonstrate any reason for the bankruptcy court to allow administrative expense claims for the forfeiture of reclamation bonds because they did not benefit the estate. Further, the ASMC did not liquidate the costs of clean up during the administration of the chapter 11 case, so the environmental argument is not persuasive. Lastly, any subrogation rights the Bonding Companies may have had are irrelevant because the ASMC, as a general unsecured creditor, is not in a better position than the Bonding Companies. The decision of the bankruptcy court is affirmed.

Dated this 30th day of September, 2002

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE